Filed 12/30/21

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Petitioner,<br><br>    v.<br><br>THE SUPERIOR COURT OF SAN DIEGO COUNTY,<br><br>    Respondent;<br><br>DANIEL G. VALENZUELA,<br><br>    Real Party in Interest. | D079089<br><br><br><br>(San Diego County<br>Super. Ct. No. SCD281685) |

ORIGINAL PROCEEDINGS in mandate.  Laura H. Parsky and Francis M. Devaney, Judges.  Petition granted.

Summer Stephan, District Attorney, Mark A. Amador, Deputy District Attorneys for Petitioner.

Katherine Braner, Chief Deputy Public Defender, Abram Genser and Jeremy Kennedy Thornton, Deputy Public Defenders, for Real Party in Interest.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Christine Y. Friedman, Deputy Attorneys General, as Amicus Curiae on behalf of Petitioner, upon request of the Court of Appeal.

Before 2018, a person who aided and abetted only an intended assault could be found guilty of second degree murder if a resulting death was a natural and probable consequence of the assault. The aider and abettor did not have to intend to aid the perpetrator in committing the life endangering act, nor be subjectively aware of the risk to human life. But that is no longer California law. Murder charges that might have been brought before 2018 using the natural-and-probable-consequences doctrine must now be pursued, if at all, on a direct aiding and abetting theory. And that requires, among other things, the aider and abettor acted with malice aforethought. The challenging question this case poses is what evidence suffices, for purposes of a *preliminary hearing*, to bind over a defendant on a direct aiding and abetting theory of implied malice murder.

The factual setting is, sadly, as familiar to this court as it is tragic: what started as a fist fight ended in a senseless killing. The real party in interest, Daniel Valenzuela, did not stab the victim. But he instigated the fight, was armed with a screwdriver, and he brought Cesar Diaz Vasquez (Diaz), a known gang member armed with a knife, to fight on his side. In the melee, Diaz stabbed 19-year-old Orlando M. a few inches above the heart.

The district attorney charged Valenzuela with murder, but the magistrate dismissed that charge at the preliminary hearing. Given the recent changes to California law, this is a very close case. But mindful that "the showing required at a preliminary hearing is exceedingly low" (*Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 544 (*Zemek*)), and exercising independent review, we conclude there was sufficient evidence to bind over Valenzuela on an implied malice murder theory.

2

## FACTUAL AND PROCEDURAL BACKGROUND

In April 2019, Valenzuela (age 39) confronted six teenagers at a taco shop because one of them, Z.G., had "issues" with his teenage daughter. Valenzuela aggressively approached the teens, issuing gang challenges and even lifting his t-shirt to reveal his tattoos.



*Figure 1- Valenzuela and Spearman approach the teens*



*Figure 2 - Valenzuela displaying tattoos*

3

Marcus Spearman, who accompanied Valenzuela, kept the teens at bay by simulating a handgun in the pocket of his hoodie.



*Figure 3 - Spearman, simulated handgun keeping teens back*

The confrontation ended with Valenzuela challenging the older members of the group to fight later that day at a neighborhood park. The teens returned to their apartment complex where they recruited additional people, including Orlando, whose left arm was in a cast and sling from a recent injury.

The sharp contrast between Orlando's dark shirt and the white strap of his sling would identify him on surveillance video of the fight.



*Figure 4 — Orlando Going to the Fight*

Valenzuela also brought reinforcements. Along with Spearman, he picked up Diaz, who Valenzuela knew to be a gang member. Surveillance video at Diaz's apartment shows Valenzuela was wearing a blue Padres shirt.



*Figure 5 — Valenzuela at Diaz's Residence Before the Fight*

The teens arrived at the park first and congregated near a picnic table. At about 6:30 p.m., Valenzuela—armed with a screwdriver—along with Diaz and Spearman—each armed with a knife—approached them. The park's surveillance video is too grainy to discern faces, but one can clearly see three people approaching the teens.



*Figure 6 - Teens (left); Diaz, Spearman, Valenzuela (right)*

What appears as a dark shirt in the screenshot above actually has a white area on the back—consistent with the jersey Valenzuela was wearing when he picked up Diaz. Spearman can be identified by his hoodie.[1]

 

*Figure 7- Dark shirt with white on back (left)*   *Figure 8 - Spearman, in hoodie*

---

[1] The magistrate received the fight video into evidence, but excluded a legend prepared by Spearman's expert identifying Valenzuela as the one in white. The People and Diaz contend Valenzuela is the one in the dark shirt. Valenzuela disagrees, and claims he was wearing a white shirt. It is unnecessary to resolve that dispute here. Suffice to say there is ample evidence for purposes of the preliminary hearing to conclude that Valenzuela was in the dark shirt.

The initial confrontation occurred when Diaz, Valenzuela, and Spearman chased after Orlando, who they singled out because he was "mouthy" and "talking shit." Orlando escaped that skirmish unharmed. Valenzuela turned his attention to Z.G., who he threatened with a screwdriver. About a minute later, Diaz and Orlando squared off again. Diaz fell, and while he was on the ground, Orlando and two others pummeled him. About five seconds later, Orlando collapsed. He got up, but seconds later fell again. He had been stabbed near his heart, the blade penetrating about four inches, hitting his left lung and aorta. He died about 30 minutes later.

The district attorney filed a complaint charging Diaz, Spearman, and Valenzuela with murder. At the preliminary hearing, the prosecutor argued Valenzuela should be bound over as a direct aider and abettor, stating:

> "This fight is clearly Mr. Valenzuela's personal fight. . . . He is confronting these kids. He's telling them to go get their other homeboys to meet up at the park so that they can settle this. He then goes and picks up additional backup and takes them over there. [¶]

> "And all three of these people have stabbing weapons. From Mr. Valenzuela's own account to the detectives after he is arrested, he has the screwdriver out in his hand at the moment he gets out of the car . . . . [¶]

> "Even if the court doesn't feel that there is circumstantial evidence of an intent to kill, there is circumstantial evidence that Mr. Valenzuela . . . himself knew what the crime would be. . . . knowing that [Mr. Diaz] is going to commit this act swinging a knife around and acting with implied malice . . . ."[2]

---

[2] Alternatively, the prosecutor argued that Valenzuela was liable "under the natural and probable consequences doctrine." The trial court rejected that and the People abandon that theory here.

7

The magistrate (Judge Laura Parsky) found probable cause that Diaz committed murder, but stated "there is insufficient proof to support the aiding and abetting theory" against Valenzuela because "there was not sufficient evidence" he knew Diaz "had a knife and was using the knife during the course of the melee or that their particular actions aided and abetted in the use of the knife for purposes of murder." The magistrate allowed the information to be amended to charge assault with a deadly weapon (with personal use allegations) and bound over Valenzuela on those charges.

Later, the district attorney filed an information realleging the murder charge against Valenzuela (but not Spearman). Valenzuela filed a motion to dismiss under Penal Code section 995.[3] Defense counsel explained, "Malice aforethought cannot be imputed to Mr. Valenzuela simply because he showed up to the location that afternoon and threw some punches." The trial court (Judge Francis Devaney) granted the motion, stating:

> "I don't think there's enough evidence that Mr. Valenzuela had the mens rea necessary to be held liable for an implied malice theory. [¶]
>
> "We talked . . . about [the magistrate's] ruling that Mr. Valenzuela didn't know that [Diaz] was armed with a knife and didn't see it[;] I, frankly, think he probably did know that he was armed with a knife, but I still don't think that's enough . . . . [T]he law requires that Mr. Valenzuela know that his acts were dangerous to human life, and, more importantly, he deliberately acted with conscious disregard for human life, and that's where I have a problem. [¶]
>
> "Even if Mr. Valenzuela knew that [Diaz] had a knife, he surely didn't know, and there's no evidence about [Diaz's] propensity to use that knife, his violent tendencies or anything like that. And simply going to a park for a fight,

---

[3]    Statutory references are to the Penal Code.

8

even armed . . . it's very difficult for me to say that Mr. Valenzuela somehow should have known that [Diaz] would use a knife, but Spearman wouldn't, and neither would he."

After considering the People's writ petition challenging that ruling and Valenzuela's informal opposition, we issued an order to show cause and stayed further trial court proceedings against Valenzuela.

## DISCUSSION

A. *The Standard of Review—Independent Review of the Magistrate's Ruling*

"[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the [forgoing] powers, and sits merely as a reviewing court . . . ." (*People v. Laiwa* (1983) 34 Cal.3d 711, 718.) Accordingly, we disregard the superior court's determination and instead consider the magistrate's ruling. (*People v. Scott* (1999) 76 Cal.App.4th 411, 415–416.)

"A magistrate's function at a felony preliminary hearing is to determine whether there is 'sufficient cause' to believe defendant guilty of the charged offense." (*People v. Abelino* (2021) 62 Cal.App.5th 563, 573 (*Abelino*).) This is a level of proof below even preponderance of the evidence. (*Ibid.*) There need only be "some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Rideout v. Superior Court* (1967) 67 Cal.2d 471, 474 (*Rideout*); see also *Zemek, supra,* 44 Cal.App.5th at p. 544.)

Where, as here, the magistrate holds the defendant to answer on one offense but dismisses another, the district attorney may recharge the dismissed offense in an information if the evidence at the preliminary hearing showed the offense was committed and arose out of the same transaction as the related offense. (*Pizano v. Superior Court of Tulare County* (1978) 21 Cal.3d 128, 133 (*Pizano*).) But this rule is subject to an

9

important exception:  The dismissed charge cannot be realleged "if the magistrate made *factual findings* which are fatal to the asserted conclusion that the offense was committed." (*Id.* at p. 133.)

"In the context of dismissal of charges at a preliminary hearing, a court makes a factual finding when, after resolving evidentiary disputes and/or assessing witnesses' credibility, it determines there is no evidentiary support for one or more elements of a charge." (*People v. Rowe* (2014) 225 Cal.App.4th 310, 318 (*Rowe*).)  For example, in *People v. Jones* (1971) 4 Cal.3d 660, the prosecution was barred from refiling rape, oral copulation, and sodomy charges after "the magistrate found, as a matter of fact, that [the alleged victim] consented to intercourse" and no oral copulation or sodomy occurred.  (*Id.* at p. 666.)  On appellate review, such findings are conclusive if supported by substantial evidence.  (*Abelino*, *supra*, 62 Cal.App.5th at p. 573.)

"Conversely, a court makes a legal conclusion when it accepts the prosecution's evidence, but determines there is insufficient evidentiary support for one or more elements of a charge." (*Rowe*, *supra*, 225 Cal.App.4th at p. 318.)  In that circumstance, we apply independent review and the magistrate's ruling "is open to challenge by adding the offense to the information." (*Pizano*, *supra*, 21 Cal.3d at p. 133; *Zemek*, *supra*, 44 Cal.App.5th at p. 546.)

Here, the parties dispute whether the magistrate made factual findings or instead drew a legal conclusion.  The following statement by Judge Parsky is the main source of this debate:

> "In this case the Court finds there was insufficient proof that these defendants knew that in this case the perpetrator of the murder intended to commit murder as opposed to engage in the fight, that there was no evidence that they saw the weapon ahead of time, had any

10

conversations about the weapon, or even saw it at any time during the fight and were in a group where they could have seen the weapon and aided and abetted as they saw the weapon displayed, in essence. [¶]

"So there might be other scenarios where it could be more clear, but in this case the court doesn't find the evidence shows that."

Focusing on "the court finds there was insufficient proof," the People contend the magistrate reached a legal conclusion. In contrast, Valenzuela asserts the ruling is actually based on findings that he did not (1) see Diaz's knife; (2) speak with him about it; (3) know Diaz intended to kill; and (4) know his actions aided and abetted Diaz's using the knife to kill.

Because the dispute over whether the magistrate made findings affects the standard of review, we address it first. The distinction between a factual finding and a legal conclusion "is clear enough in the abstract, but has posed some difficulty in its practical implementation." (*People v. Superior Court* (*Day*) (1985) 174 Cal.App.3d 1008, 1015.) The critical inquiry is whether the magistrate accepted the proffered evidence, but deemed it insufficient—or instead, after resolving evidentiary disputes and/or assessing credibility, determined the evidence did not support one or more essential elements of the charge. (*Rowe, supra*, 225 Cal.App.4th at p. 318.)

Valenzuela contends, and we agree, the distinction does not turn on whether the magistrate uttered certain " 'magic words.' " Nevertheless, the analysis must necessarily start with Judge Parsky's ruling—on the reasonable assumption she meant what she said and said what she meant.

Judge Parsky began by stating there was "insufficient proof" that Valenzuela had the requisite knowledge to support a finding of implied malice. This language ordinarily indicates a legal conclusion. (See *People v. Farley* (1971) 19 Cal.App.3d 215, 221 [magistrate's conclusion that "the

11

evidence . . . is insufficient" is a legal conclusion].)  To be sure, she went on to give certain examples of that insufficiency.  For instance, she stated there was "no evidence" that Valenzuela saw Diaz's knife.  Valenzuela construes this remark and others like it as factual determinations.

We cannot agree.  To conclude there was "no evidence of X" does not constitute a finding of "not X."  This is because "[a]n absence of evidence is not the equivalent of substantial evidence." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 655.)  "No finding can be predicated on the absence of evidence." (*Louis & Diederich, Inc. v. Cambridge European Imports, Inc.* (1987) 189 Cal.App.3d 1574, 1591.)  Here, there was no factual finding by Judge Parsky that Valenzuela did *not* know Diaz had a knife, and her statement regarding the lack of direct evidence does not mean there could be no rational basis for concluding from the circumstantial evidence that he did know.  (*Rideout, supra,* 67 Cal.2d at p. 474.)

Valenzuela further contends that *Dudley v. Superior Court* (1974) 36 Cal.App.3d 977 (*Dudley*), *Pizano, supra*, 21 Cal.3d 128, and *Zemek, supra*, 44 Cal.App.5th 535 support his argument.  But those cases actually undercut his claim.

In *Dudley*, the defendant had beaten the victim, who died of a brain hemorrhage caused by a preexisting aneurysm of which the defendant was unaware. (*Dudley, supra*, 36 Cal.App.3d at p. 979.)  The complaint charged murder, and after the preliminary hearing the magistrate held the defendant to answer for involuntary manslaughter saying, "I did not think this was murder. . . . I think it requires a great deal more proximate cause and the actual cause of death when you are dealing with a pre-existing condition," and "[t]*here is no evidence* [of] . . . either expressed or implied malice." (*Id.* at p. 980, italics added.)  The appellate court reversed, determining the

magistrate did not make a factual finding, but instead reached an erroneous legal conclusion that the offense was no more than manslaughter. (*Id.* at p. 985.)

*Pizano* is similar. There, the magistrate refused to hold the defendants to answer for murder, stating "implied malice had not been shown." (*Pizano*, *supra*, 21 Cal.3d at p. 133.) The Supreme Court held this was a legal conclusion. (*Id.* at pp. 133–134.)

Valenzuela's reliance on *Zemek* is similarly unpersuasive. There, the magistrate determined there was sufficient evidence of implied, but not express malice. (*Zemek*, *supra*, 44 Cal.App.5th at p. 544.) On appeal, the court held that because the magistrate did not make any explicit credibility findings and the prosecution witnesses were not significantly impeached, the magistrate reached a legal conclusion that was subject to independent review. (*Id.* at p. 547.)

Similarly here, the magistrate did not make explicit credibility determinations or resolve disputed foundational facts. Her determination was a legal conclusion about the sufficiency of the evidence to support a bind over that we review independently.

B. *A Person Can Aid and Abet Implied Malice Murder*

An additional threshold issue remains. Valenzuela contends the same statutory changes prohibiting aiding and abetting liability under a natural and probable consequences theory also preclude conviction on an implied malice theory. Although *People v. Powell* (2021) 63 Cal.App.5th 689, 713 (*Powell*) recently rejected this same argument, Valenzuela contends *Powell* was wrongly decided and is inconsistent with *People v. Gentile* (2020) 10 Cal.5th 830 (*Gentile*).

13

We read *Gentile* differently and agree with *Powell*'s analysis.  In *Gentile*, the Supreme Court stated that "notwithstanding . . . [the] elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder *if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life.*" (*Gentile, supra,* 10 Cal.5th at p. 850, italics added.)  We understand this to mean that an aider and abettor who acts with implied malice can be guilty of murder entirely apart from the natural and probable consequences doctrine.  Accordingly, *Gentile* precludes Valenzuela's argument.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

*Powell* carefully explains that direct aiding and abetting of an implied malice murder is based on "the aider and abettor's *own* mens rea." (*Powell, supra,* 63 Cal.App.5th at pp. 712–713, italics added.)  Emphasizing the point, *Powell* adds that the requisite intent "must be *personally harbored* by the direct aider and abettor" and consists of "knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that the *act* is dangerous to human life, and acting in conscious disregard for human life." (*Id.* at p. 713, italics added in first quote.)  In this key respect, *Powell* is entirely consistent with *Gentile* in basing murder liability on the aider and abettor's own state of mind— *conscious* disregard for life.

C. *There Was Sufficient Evidence that Valenzuela Aided and Abetted Murder With Implied Malice.*

    1. *Implied Malice*

"Murder is the unlawful killing of a human being . . . with malice aforethought." (§ 187, subd. (a).)  Malice is either express or implied. (§ 188, subd. (a).)  Express malice is a deliberate intent to unlawfully kill. (*Id.*,

subd. (a)(1).)  Malice is implied "when the circumstances attending the killing show an abandoned and malignant heart."  (*Id.*, subd. (a)(2).)

"The statutory definition of implied malice, a killing by one with an 'abandoned and malignant heart' (§ 188), is far from clear in its meaning." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).)  "Two lines of decisions developed, reflecting judicial attempts to 'translate this amorphous anatomical characterization of implied malice into a tangible standard a jury can apply.' " (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103 (*Nieto Benitez*).) One originated in Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470 (*Thomas*), which stated that malice is implied when "the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a *high probability* that it will result in death." (*Id.* at p. 480 (conc. opn. of Traynor, J.), italics added.)  This has been referred to as the *Thomas* test.  (See *Knoller,* at p. 152.)

The second line of decision stems from *People v. Phillips* (1966) 64 Cal.2d 574 (*Phillips*), which states malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*Id.* at p. 587.)  This is often referred to as the *Phillips* test.

In *People v. Watson* (1981) 30 Cal.3d 290, the Supreme Court held that the implied malice definitions in *Thomas* and *Phillips* express the same standard.  (*Watson*, at p. 300.)  Subsequent Supreme Court decisions have never said otherwise.  (See, e.g., *Nieto Benitez, supra*, 4 Cal.4th at page 104; *Knoller, supra*, 41 Cal.4th at page 152).  Under both tests, "the ultimate inquiry involves a determination of probability:  Although an act that will

certainly lead to death is not required, the probability of death from the act must be more than remote or merely possible." (*People v. Cravens* (2012) 53 Cal.4th 500, 513 (conc. opn. Liu, J.).) Thus, viewing both standards as one in the same, implicit in the *Phillips* formulation is that the natural consequences of the act entail a significant risk of death.[4]

2. *Aiding and Abetting*

"A person who aids and abets the commission of a crime is culpable as a principal in that crime. (§ 31.) Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime." (*Gentile, supra,* 10 Cal.5th at p. 843.)

Aider and abettor liability is " 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*Powell, supra,* 63 Cal.App.5th at p. 710.) In other words, " '[a]n aider and abettor must do something *and* have a certain mental state.' " (*Id.* at p. 712.)

*The Act:* "In the context of implied malice, the [act] required of the perpetrator is the commission of a life-endangering act.[ ] For the direct

---

[4] Of the two formulations, the Supreme Court tends to use *Phillips* most recently and most often. (E.g., *People v. Smith* (2018) 4 Cal.5th 1134, 1165; *People v. Soto* (2018) 4 Cal.5th 968, 974; *People v. Rangel* (2016) 62 Cal.4th 1192, 1220; *People v. Bryant* (2013) 56 Cal.4th 959, 965; *Cravens, supra,* 53 Cal.4th at pp. 507–508; *People v. Chun* (2009) 45 Cal.4th 1172, 1181; *Knoller, supra,* 41 Cal.4th at p. 143.) Moreover, despite his concurring opinion in *Cravens* (suggesting a distinction between *Thomas* and *Phillips*), Justice Liu authored a majority opinion the following year relying only on *Phillips.* (*Bryant,* at pp. 965, 968.) It is also noteworthy that Supreme Court decisions using *Thomas* instead of *Phillips* mostly involve cases of provocative act murder. (See, e.g., *People v. Concha* (2009) 47 Cal.4th 653, 663; *People v. Cervantes* (2001) 26 Cal.4th 860, 867; *People v. Sanchez* (2001) 26 Cal.4th 834, 839, fn. 3; *Pizano, supra,* 21 Cal.3d at p. 134; *Taylor v. Superior Court* (1970) 3 Cal.3d 578, 583–584.)

16

aider and abettor, the [act] includes whatever acts constitute aiding the commission of the life endangering act.  Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering *act*, not the result of that act." (*Powell*, *supra*, 63 Cal.App.5th at p. 713, fn. omitted.)

*The Intent:*  "[T]he aider and abettor of implied malice murder need not intend the commission of *the crime* of murder.  Rather . . . he or she need only intend the commission of the perpetrator's *act*, the natural and probable consequences of which are dangerous to human life, intentionally aid in the commission of that *act* and do so with conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at p. 714.)  The requisite intent is a subjective one—the defendant must have *"actually appreciated* the risk involved." (*People v. Contreras* (1994) 26 Cal.App.4th 944, 954.)  Implied malice can exist even if the act results in an accidental death.  (*Ibid*.)  And like all other elements of a crime, implied malice may be proven by circumstantial evidence.  (*People v. Klvana* (1992) 11 Cal.App.4th 1679, 1704.)

3. *There Was Sufficient Evidence of Aiding and Abetting Implied Malice Murder*

There was sufficient evidence that Valenzuela instigated and encouraged Diaz's participation in an armed melee, which under the circumstances was conduct that carried with it a significant risk of death. Valenzuela arranged for the fight, specified its time and place, solicited Diaz, a known gang member, to join him, and brought him to the fight armed with a knife.  We agree with Judge Devaney's comments that it is "reasonable to think there [were] conversation[s] [between Valenzuela and Diaz] about 'Where [are] we going?  Who [are] we fighting?  Are they going to be armed? Are you guys armed?  Should I arm myself?"  Moreover, the surveillance video shows that along with Diaz and Spearman, Valenzuela targeted

17

Orlando—a man with one arm in a sling—as their first victim. Mindful that " 'the showing required at a preliminary hearing is exceedingly low,' " and there need only be "some rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it" (*Abelino, supra*, 62 Cal.App.5th at p. 573), we conclude that Valenzuela aided or encouraged the commission of the life endangering act. (See *Powell, supra*, 63 Cal.App.5th at p. 713.)

There is also sufficient evidence that Valenzuela acted with the requisite mental state. "A finding of implied malice depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a subjective standard." (*Watson, supra*, 30 Cal.3d at pp. 296–297.) Since rarely would a defendant provide direct evidence of that, "implied malice may be proven by circumstantial evidence." (*People v. Superior Court* (*Costa*) (2010) 183 Cal.App.4th 690, 697.) "The very nature of implied malice . . . invites consideration of the circumstances preceding the fatal act.' " (*Nieto Benitez, supra,* 4 Cal.4th at p. 107.)

Among the circumstances courts have found relevant in determining whether malice may be inferred are the victim's vulnerability, the number of assailants, the ferocity and duration of the attack, and the unusualness or unexpectedness of the victim's death. For example, in *Cravens, supra*, 53 Cal.4th 500, the Supreme Court upheld a murder conviction under an implied malice theory where the defendant's behavior before and during the fight demonstrated "this was not, as defendant suggests, a simple fistfight." (*Id.* at p. 511.) Before the fight, the defendant was "egging on" and encouraging his friends to fight the victim. (*Ibid*.) The victim was particularly vulnerable, not only because he was smaller than the defendant

18

and intoxicated, but also because he was already fatigued by the beating just inflicted by the defendant's cohorts. (*Id.* at pp. 504–505, 508.)

Every legitimate inference that may be drawn from the evidence must be made in favor of the charges alleged in the information. (*Rideout, supra,* 67 Cal.2d at p. 474.) Viewed in that light, the parallels between *Cravens* and Valenzuela's case are numerous. This too was not a simple fistfight. The taco shop confrontation was not merely a challenge to fisticuffs, but rather a show of force and threat of deadly force, complete with gang challenges and a simulated handgun. Then, instead of fighting the teens himself, Valenzuela sought additional muscle—Diaz, who he knew to be a gang member. It is not unreasonable to believe Valenzuela brought an armed gang member to the fight based at least in part on Diaz's propensity or at least willingness to use deadly force.[5]

Moreover, Valenzuela came to the fight armed, indicating he knew it would be dangerous—so dangerous he needed a weapon to either defend himself or inflict serious injury or death. And since Valenzuela was armed and Diaz travelled with him to the park, it is also reasonable to believe he knew Diaz had a knife. Additionally, like the victim in *Cravens,* here Orlando was particularly vulnerable. He could only defend himself with one arm, and that disability was obvious. (See *Powell, supra,* 63 Cal.App.5th at p. 714.)

---

[5] The superior court determined there was insufficient evidence of implied malice because "there's no evidence about [Diaz's] propensity to use that knife, his violent tendencies or anything like that." If the standard were proof beyond a reasonable doubt, we might well agree. But the standard here is decidedly lower. Evidence that Valenzuela knew Diaz was a gang member and was armed is enough from which to infer knowledge of Diaz's violent propensities for purposes of the preliminary hearing.

Valenzuela protests that this version of aiding and abetting implied malice murder simply resurrects the natural and probable consequence doctrine as applied to an assault with a deadly weapon. But while it is fair to say that the "act" Valenzuela fostered and instigated was an assault with a deadly weapon, his culpability for implied malice murder on a direct aiding and abetting theory requires more than just showing an intended aggravated assault. Rather, a determination that the intended assault involved a significant risk of death is necessary. Perhaps more importantly, even if the requisite act were the same, the required mental state is significantly different. As both *Gentile* and *Powell* make clear, to commit implied malice murder as an aider and abettor one must personally harbor implied malice. This means the defendant " 'knows that his conduct endangers the life of another and . . . acts with conscious disregard for life.' " (*People v. Soto* (2018) 4 Cal.5th 968, 974, quoting *People v. Watson* (1981) 30 Cal.3d 290, 300; accord *Gentile, supra,* 10 Cal.5th at p. 844 ["the aider and abettor [of a murder] must possess malice aforethought"].) The natural and probable consequences doctrine that the Legislature sought to eliminate by enacting Senate Bill No. 1437 did not require such a finding. (*Gentile,* at p. 845 ["the natural and probable consequences doctrine allowed [the defendant] to be convicted of murder without personally possessing malice aforethought"].) Considering all the evidence and reasonable inferences at this stage of the proceedings, there is "some rational ground for assuming the possibility" (*Rideout, supra,* 67 Cal.2d at p. 474) that Valenzuela knowingly instigated and encouraged conduct by Diaz, fully appreciating that it posed a significant risk to human life, and consciously disregarded that risk.

## DISPOSITION

Let a writ issue commanding respondent, immediately upon receipt of the writ, to vacate the April 29, 2021 order granting the motion of real party in interest to dismiss count one from the information as to Valenzuela and to enter a new order denying the motion. The stay issued by this court on July 12, 2021, is dissolved upon the issuance of the remittitur.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

HALLER, J.

21